RUSSELL (BLUE v.). See Case No. 1,568.

RUSSELL (BUTLER v.). See Case No. 2,-243.

RUSSELL (DRIGGS v.). See Case No. 4,084.

RUSSELL (ENGLISH v.). See Case No. 4,-491.

RUSSELL (FAXON v.). See Case No. 4,707.

RUSSELL (FLINT v.). See Case No. 4,876.

---

## Case No. 12,154.

RUSSELL et al. v. FORTY BALES COTTON, Proceeds of.[1]

District Court, S. D. Florida.   Dec., 1872.

DERELICT — RIGHT OF UNITED STATES AS AGAINST SALVORS—RESOLUTION OF JUNE 21, 1870.

[1. The uninterrupted continuance for 30 years of a custom of a certain district court in

---

[1] [Not previously reported.]

regard to rights to derelicts raises an inference of the legality thereof.]

[2. None of the prerogatives of the English crown devolved by succession upon the United States government, but all powers of the latter spring from the grant expressed in their written constitution.]

[3. As against salvors the United States are not entitled to derelict, either by the resolution of June 21, 1870, or the English rule on this subject, or otherwise. Peabody v. Proceeds of Twenty-Eight Bags of Cotton, Case No. 10,-869, disapproved.]

[4. The resolution concerns property illegally used or enjoyed during the Rebellion, and not ordinary derelict.]

[This was a libel for salvage by William Russell and others against the proceeds of 40 bales of cotton, derelict. The United States intervened praying a decree in their favor for the remnant after payment of salvage.]

W. C. Maloney and Winer Bethel, for libelants.

C. R. Mobley, U. S. Atty., for interveners.

LOCKE, District Judge. The motion filed herein by the district attorney for and in behalf of the United States opens in full the question of derelicts, and the proper manner of disposing of the final residues after the payment of salvage, expenses, &c., and is intended as a test for several cases of like nature now pending herein. There is no question of fact as to the condition of the property from the sale of which the proceeds have arisen, nor as to its having been a wreck of the sea, driven on shore, and properly coming under the term "wreccum maris" or "derelict."

In support of the motion an able argument has been made claiming that all such residues belong to the sovereign power, and should be paid into the treasury of the United States. On the other hand, it has been claimed that, in the absence of any municipal or national law on the subject, the rule to be followed is that of the law of nations that the finder is entitled to possession and control as against the whole world except the original owner. Each of these positions have been ably argued, and many authorities cited.

The present condition of the question as determined by judicial decisions of the courts of this country is quite unsettled, and no sufficiently distinct ruling has been made and sustained as to preclude the necessity of going back of the courts for authority. In this court the practice of delivering the residue, in the absence of any claimant, to the finder, after the lapse of a year and a day, has been universally followed, and a standing rule of the court to that effect been in force. In reply to this it is urged in support of the motion that the power that makes a rule can unmake it, and the court has the same authority to unmake or change rules, when convinced of their impropriety, that it had to make and ordain them. This position is readily admitted, and the right and power is well understood, but the existence of a rule for

the last thirty years, and the enforcement of a principle under it by three predecessors, the judgments and decisions of each one of whom I am bound to recognize and respect, compel me to throw the burden of the contest upon him who moves to change or annul it.

In opposition to this practice and rule the case of Peabody v. Twenty-Eight Bags of Cotton [Case No. 10,869], involving the same question, which was decided by Judge Davis of the district of Massachusetts (1829), decreeing the residue therein to the United States. This is the only case referred to in the argument, or which I have been able to find, as having been decided in this country in that manner. That the honorable judge of this court was well aware of the decision in that case and informed of that opinion, upon which it is based, is clearly shown by his mention of it in his work on Wreck and Salvage (Marv. Wreck & Salv. p. 144), but even after that he was never so far convinced of the impropriety of his course as to make any change therein, although he was on the bench many subsequent years, and decided many cases of a similar nature.

Going back of any judicial decision and seeking legislation upon the subject, my attention is called to the joint resolution of congress (1870), approved June 21, 1870 [16 Stat. 380], which authorizes the secretary of the treasury "to make such contracts and provisions as he may deem most advantageous for the interest of the government for the preservation, sale, or collection, of any property, or the proceeds thereof which may have been wrecked, abandoned, or become derelict, being within the jurisdiction of the United States. and which ought to come to the United States, and any moneys, dues, and other interests, lately in the possession of, or due to the so called Confederate States or their agents, and now belonging to the United States, which are now held or retained, by any person or municipality whatever." In connection with this statute two questions arise: First, is this resolution intended to apply to such cases as the present, and to declare that property wrecked, abandoned. or become derelict "ought to come to the United States"? and, secondly, whether, if such was the intention, the language is sufficient to declare that property which would not otherwise be so decreed. "ought to come to the United States." There seem to be several classes of property mentioned in the objective clause which are to be effected by this resolution, to either one of which the term "ought to come to the United States" could apply with equal aptness, namely, property wrecked, "that ought to come to the United States," property abandoned, "that ought to come to the United States," or property become derelict "that ought to come to the United States." If the term "that ought to come to the United States" is intended as a declaratory phrase, intending to declare that the kinds of property mentioned ought to come to the

United States, the error of that construction is at once apparent when we apply it to either of the other classes, as it cannot be claimed that all wrecked property, nor that all abandoned property should come to the United States, and that construction cannot be held to be applicable to one class and not the other, and I am therefore convinced that the clause is not intended as a declaratory clause, but as a descriptive and limiting one. —limiting the operation of the law to those classes of property wrecked. abandoned. or become derelict, "that ought to come to the United States."

Again, should this construction of this resolution be incorrect, is the language sufficiently plain, distinct, and declaratory to give to government the possession custody and control of property which the courts would, or had otherwise decreed to another party? The main question at issue in the pending motion is, "ought the residues in these cases to come to the United States"? Should the decision thereon, in the absence of this resolution, be that these residues ought not to come to the United States, is the language of the resolution sufficient to defeat such a decree? I am of the opinion that it is not. It may be asked, to what, then, does the resolution apply? for no act of any legislative body should be so construed or interpreted as to render it fruitless. The naval and military operations, both of the United States and the so-called Confederate States during the late war, had strewn the harbors of the entire coast with numerous wrecks, and also many portions of the country with abandoned or derelict property. that rightfully "should come to the United States," either from being originally the property of the United States, or the property of the public enemy, or from having been engaged in violating the blockade. The continuation of the resolution points more plainly at the fact that in the mind of the legislator the property. dues, and claims "that ought to come to the United States" through the late war were intended. and no others. Again. the property "which may have been" (at that time) and the money, dues. and interest "now" (at that time) held, are alone referred to; and I cannot believe that. had congress intended to establish a final law for the disposition of all derelicts within its jurisdiction, it would have confined its language only to the past and present, and the property then in condition to be claimed, omitting all that might become derelict, and on that account alone would I consider that the resolution could not be held to apply to this case, more particularly as at the approval of that resolution none of the proceeds now claimed were in the hands or control of any party, the property not having been found until several months afterwards.

Finding. then. no final disposition of the question by the judicial decisions or the

legislative enactments of our country, we are compelled to go elsewhere, and inquire how this question has been treated by the courts of other countries. There have been two arguments advanced in support of the motion, independent of any decision or law of our country, namely: First, that by the general principle of perpetuation, continuance or succession of laws in conquered provinces,—a species of subrogation of power,—the laws of England remained in force in the United States; that the laws of the mother country survived to the sovereignty of the United States, and became attached to all the rights and prerogatives of sovereignty in or under the laws of the government from which the provinces had been conquered, or had withdrawn themselves; that the laws of England recognized the proceeds of all derelict as attached and belonging to the sovereignty power of the nation, and hence this same right now exists without the requirement of any legislation. Perhaps I have stated the matter somewhat more broadly than was done in the argument, but, I consider, none too broad for the fair examination of this question. There is no question or doubt regarding the law in England upon the subject, and that it has been correctly stated. The case of The Aquila, 1 C. Rob. Adm. 37, settles that beyond any dispute. But whether the same laws must be in force in this country to-day on account of the laws of the mother country remaining in force after a change of government, or whether the United States succeed to the prerogative of the British crown, is the question to be considered. Again, to whom do these said prerogatives of sovereignty attach or belong, the United States or each separate state? The first form of union was a confederation or union of the several states in their sovereignty, and the rights of sovereignty attaching thereto were plainly and distinctly expressed and laid down. The rights pertaining to the admiralty with which congress was invested were "power to deal with all captures and prizes made by the land or naval forces of the United States. Curtis, Const. 1–145; to grant letters of marque and reprisal in times of peace, and to establish courts for the trial of piracies and felonies committed on the high seas, and for determining appeals in case of capture."

It is claimed in the argument that admiralty power must necessarily be annexed to the general government whose power it is to decide peace and war. In the absence of all mention of the subject in the articles of confederation, this might be claimed with propriety, but where the admiralty powers necessary for the purposes of war, and convenient in time of peace, are so plainly and expressly set forth, I do not consider that the argument, although plausible, will hold good as to other admiralty privileges not necessarily connected with the warmaking power, but merely touching the relations existing between sovereign and subject. The supreme court, in Martin v. Hunter, 1 Wheat. [14 U. S.] 325, says: "It is perfectly clear that the sovereign powers vested in the state government by their respective constitutions remained unaltered and unimpaired, except so far as they were granted to the government of the United States." Also, in Wheaton v. Peters, 8 Pet. [33 U. S.] 658, it says: "It is clear there can be no common law of the United States. The federal government is composed of twenty-four sovereign and independent states, each of which may have its local usages, customs and common law. There is no principle which pervades the Union and has the authority of law that is not embodied in the constitution or laws of the Union." I am well aware that these opinions were given upon questions differing somewhat from the ones under consideration, but on the one point, namely, the continuation of the laws of the land, the succession of one national government to the prerogatives of the other, and the relations existing between the people and sovereign power, I consider them parallel. This is the only prerogative of the crown to which it is claimed the United States has succeeded by the mere force of national succession. At least I have been unable to find any other right or prerogative claimed for, or assigned to the government without constitutional provisions or legislative enactments. The powers of peace and war are conferred upon congress, but it has never been assumed that the droits of admiralty in prize under the English law belonged to the United States, and our own prize laws have been enacted. The same with regard to royal fishes, which were made a source of revenue, and provided for in the same act (17 Edw. II. c. 11) as derelicts, based, as Blackstone says, on the same reasoning, namely, to yield a revenue to the crown. 1 Bl. Comm. 290. The Adventure, 8 Cranch [12 U. S.] 221, has been referred to. In that case I can find nothing establishing, or even implying, the right of the United States to droits of admiralty, but, on the contrary, the supreme court declares that, although enemies' property, found in the country, is liable to be disposed of by the legislative power of the country, yet, until some act is passed, it is under the protection of the law, and may be claimed after the termination of the war. The questions of right of admiralty or of the government to the residue were not considered, save as to its being enemy's property, found in the country at the declaration of war.

Mr. Benedict, in his able and valuable work on Admiralty, says: "A fruitful source of error in regard to the government of the United States is its supposed relation to the British government. The United States is sometimes said to be, and in a limited historical sense is, an offspring from Great Britain; and most of the people of the colonies at the time of the Revolution were the descendants

of British subjects." But he says: "The government and laws of the United States as established by and under the constitution cannot in any proper sense be called an off-shoot from those of Great Britain, nor have they any relation or similarity to them. Our constitution was a new creation, made after the Revolution, after twelve years of actual independence under the confederation, and was derived not from any parent state, but from ourselves, and nowhere else; * * * and the institutions of Great Britain cannot justly be considered as in any manner the exponents of our own. Our constitution and laws are written in the English language, and of course to that language we must look for the proper meaning and force of their terms, and this is the only link that connects the laws and institutions of the general government with those of any other nation. When therefore the constitution or laws use the terms, 'equity,' 'common law,' 'admiralty,' 'maritime law,' etc., it is to English law and to English dictionaries we must resort for the meaning of those terms, but it by no means follows that we must look to the same source for the rules of decisions our courts are to follow." These remarks express so clearly and distinctly my own views on this question that I will merely say that I cannot consider that there is any authority for the doctrine that the United States have succeeded to rights of the English sovereignty or droits of admiralty as a national prerogative.

Thus being satisfied, first, that the only act of congress of which I have any knowledge that could possibly be construed as relating to this subject is neither intended to apply to such cases, nor is sufficient to influence a decision herein; secondly, that I do not consider that the droits of admiralty, as prerogatives of sovereignty attaching to the crown of England, were succeeded to by the United States as a nation,—the only remaining question is whether, by the general maritime law of nations which the courts of this country are bound to recognize, the residue in such cases should be paid into the public treasury, or be left in control of the finder. As the possession of personal property is prima facie evidence of ownership, and occupation gives such a right of possession as to force the contestant to show a better title, I consider it binding upon the government to show such superior title to the amounts in question herein.

In the case of American Ins. Co. v. Three Hundred & Fifty-Six Bales of Cotton, 1 Pet. [26 U. S.] 546, Chief Justice Marshall says: "A case in admiralty does not in fact arise under the constitution or laws of the United States. These cases are as old as navigation itself, and the law, admiralty and maritime, as it has existed for ages, is applied by our courts to the cases as they arise." Judge Davis says: "The rules and usages of nations on this head I consider to be a portion of our maritime law, giving authority to the national courts to judge, award, and decree respecting causes of admiralty and maritime jurisdiction as such maritime laws and usages shall direct or authorize." This is admitted wherever the rights or interests at stake in any way relate to or concern the property or persons of any subjects of any other nations. But there are in the admiralty laws of every nation rules and regulations concerning municipal rights and powers that cannot affect the general maritime law of nations, any more than can the different regulations in regard to liens of material men, quarantines, or harbor or coast regulations. Judge Benedict, before referred to, says in chapter 4, § 39: "Every maritime nation has certain rules or laws in relation to ships, shipping, and maritime matters which are peculiar to itself,—such as its navigation acts, the municipal regulations, of its harbors, creeks and bays, * * * obstructions in rivers, prohibited nets, royal fisheries, and other droits of the admiralty constituting its maritime police. These were originally enforced by the admiral exercising in part a high executive and administrative function, which was a portion of the royal prerogative, and was in substance confined to the waters and the vessels of his own nation. * * * These are properly the admiralty law of any country. * * * Each nation has its own system of admiralty law, which it changes and modifies at pleasure." It has been remarked that the mere executive functions of the admiral, his prerogatives and perquisites, have no existence here. "The words 'admiralty' and 'maritime,' as they are used in the constitution and acts of congress, are by no means synonymous." "Maritime cases, or more properly those arising under the maritime law, which is not the law of a particular country, and does not rest for its character or authority on the peculiar institutions and local customs of any particular country, but consist of certain principles of equity and usages of trade which general convenience and a common sense of justice have established to regulate the dealings and intercourse of merchants and mariners in matters relating to the sea, in all the commercial countries in the world." To which of these two classes does this question belong,—the admiralty of local character and national interest, or maritime in its nature and of general application.

It has been ably argued in support of the motion that the title of occupancy no longer exists. Had the argument been that the title by occupancy has been greatly modified and restricted, I would have admitted it at once; but that it no longer exists, as between the occupant and every one else except the original owner, especially in the absence of any municipal regulations, is, as I consider, an unauthorized conclusion. The title by occupancy I consider still to exist,

although much limited, and subject to many equitable conditions and restrictions, and to apply to all classes of property, subject only to restriction which change with the circumstances under which possession is acquired. I am unable to perceive that reading why the title by occupancy in derelict or abandoned property, as long as unclaimed or voluntarily forsaken, was against every one but the rightful owner, in the absence of particular laws to the contrary, is not of as much force as ever. Society has demanded a more extensive and thorough notice of the finding and more careful observations of the rights of others in the thing before there can be considered to be an implied abandonment, but I do not consider that that divests a finder of all right of occupancy. Kent says: "Another instance of acquisition by occupancy which still exists under certain limitations is that of goods casually lost by the owner and unreclaimed or designedly abandoned by him, and in both cases they belong to the fortunate finder." He modifies this by stating that certain classes of goods have been excepted from this general rule, but cites none but those excepted by positive law. This is not a question of divesting an original owner of his rights, nor as to the perfection of the title acquired by occupancy, but as to in whom the limited title given by occupancy until a claimer may appear vests.

It is claimed that there is at present no such condition of things known as derelict in the sense of that term as used in the civil law. Judge Bee says in British Consul v. Twenty-Two Pipes and Ten Hogsheads of Wine [Case No. 1,900]: "I continue to think there is no difference between wreck and derelict, except the property is in the one instance found on land, in the other at sea. In both, the original owners, if they can be found, have a paramount claim upon payment of reasonable salvage."

The special rights given a first occupant of derelict under the civil law are at this age of the world denied in all cases except when they are claimed by an action of a state or nation to be forfeited. And now such special rights and prerogatives, namely, as a positive title as against even the original owner, are seldom insisted upon; and, although no such voluntary abandonment is presumed at first, yet almost every nation has decided that the absence of a claimant or the neglect to claim is an implied abandonment, which places such property in the position of derelict. Justinian, lib. 2, tit. 1, § 47. Except from the list of derelict which may belong to the first occupant things thrown overboard from vessels in a storm, "for they remain the property of the owner as though they were not thrown away through dislike, and whoever takes them up with guilty intent is guilty of theft." But that does not change the character of a derelict of the sea, but shows that the law of to-day has greatly restricted the rights of the finder of derelicts found on land, as the same law then applied to derelicts at sea now holds good to derelicts found on land. Puff. Law Nat. bk. 4, c. 6, § 12, says: "We likewise acquire by occupancy things in which the dominion they before lay under is extinct; and this happens if a person either openly throws aside a certain thing with sufficient indications that he desires it should no longer be his own, but should lie free for the first taker, without designing hereby to gratify any one else; or if, having at first lost possession against his will, he afterwards gives the thing over either as despairing to recover it, or because the recovery of it is not tantamount. This is certain: That if we lose possession of anything against our will, or suppose we drop a thing by the way, the property does not pass from us, or accrue to the finder, till it appears we absolutely give it over for lost, which is usually understood by our forbearing to search or inquire after it. Hence, if a man finds somewhat which it is not probable the owner should voluntarily reject, he ought to give fair notice that upon a just claim it may be reassumed. But if the owner cannot be discovered, then it is but right the thing should be kept by him that found it." Yet Aelian reports it the law of the Stagarytes: "Take not up what you lay not down." The same of the Biblians, and among Solon's laws were those of the same import. These evidences of such a particular regard for the rights of others to their property could of course have no weight in considering a question where the property has been rescued from certain destruction by the sea. Mr. Seldons informs us that among the ancient Jews articles marked were presumed not to be voluntarily surrendered; therefore when such were found proclamation was made from a platform in the suburbs of their cities, that if claimed by those of the same nation they should be returned, but property belonging to Gentiles they considered themselves under no obligation to restore. In Barbeyrac's note to the section of Puffendorf quoted he says: "Those things which are forsaken having once belonged to a private person cannot be thought to belong to the state in general, but it is natural to suppose them to belong to nobody, and consequently they become the first occupants, at least if there is no law to hinder private persons from making them their own." Vatt. Law Nat. bk. 1, c. 23, § 293, speaking of the rights of nations, says: "It is necessary to mention the right to shipwrecks, the unhappy fruits of barbarism, and which almost everywhere disappeared with it. Justice and humanity cannot sanction it, except the only case where the proprietors of the effects saved from the wreck cannot be certainly known In this case these effects belong to the first possessor, or to the sovereign if the laws give him a right to them."

From these and the writings of other numerous eminent authors it appears that the only distinction, in the absence of positive law, between derelicts found at sea and those

found on land, has arisen from the presumed intent of the original owner to voluntarily abandon or not. If in the case of property found on land a claimant appears. the presumption is done away with, and the title by occupancy disappears; but if, on the other hand. no claimant appears for property found at sea, the implication and presumption of abandonment is established.. This original presumption of voluntary or involuntary abandonment cannot, in my opinion, affect in the least the final disposition of residue or the question of custody during the pendency of a notice or claim. And in the absence of this presumption, either for or against abandonment, the law of nature applies as directly to one class as the other, and by that law derelict property whose owner is unknown belongs to the finder. Chancellor Kent lays it down as a principle of natural law "that if the articles are not demanded in a reasonable time they become the property of the finder, unless some other appropriation be directed by private enactment;" and I consider that this is generally conceded to be the law of nature. And it only remains for us to examine how far this law has been changed, and how far such changes are binding upon the court.

The Laws of Oleron have been cited in argument to show that the finder was not entitled to the residue. but the section quoted positively prohibits the sovereignty from assuming any part of such goods. The article reads as follows: "If a ship is lost and all on board drowned, the lord should send out persons who should save the goods, to whom a salvage should be paid; and what remains must be kept safe a year or more, and, if no one appear and claim, they should be sold, and the proceeds given among the poor and to charitable uses; but if he (the lord) assumes such goods, either in whole or in part. to himself, he shall incur the curse and maledictions of our church." Article 32: "When goods are thrown overboard for the safety of the vessel, they become the property of him who can first possess himself of them and carry them away." "Nevertheless this holds true only in such cases as where the master, merchant, and mariners have so ejected and cast out such goods as they give over all hope or desire of ever recovering them again, and so leave them as things utterly lost and given over by them, without ever making any inquiry or pursuit after them. In which case only the first occupant becomes the lawful proprietor thereof." The five subsequent articles provide that if any property is especially locked. clasped. and protected from damage by salt water, the finder shall restore them to the owner, or put them to pious uses, according to his conscience. and the advice of some prudent neighbor. . That if one finds precious stones, gold, or silver, he ought to restore it all, deducting something for his own pains. or, if he be poor. he may keep it, if he knows not to whom it belongs. In the ob-

servation of Cleirac upon these articles it is said: "There are three sorts of goods which the sea naturally drives to land. (1st) Entire wrecks, for which the cruel droit de .bris (or admiralty of the seacoast) was in old times established by pernicious and barbarous custom. but humanity, license and passports have abolished it in ours. (2nd) Goods thrown overboard for the preservation of men's lives, the ship and cargo. Neither of these by law or the custom of the country change their proprietors, but may be claimed and recovered by them even while the goods are in being and unsold, as appears by what has been said. The third sort comprehends the two first which are not owned and demanded by the proprietor, and besides that includes all the treasures of the sea. The property of such things is in the finder or the first person who first takes them from off the ground. This is the law of nature, but princes and lords of the coast have usurped this privilege and laid claim to all the treasures of the sea that is thrown on their royalties." The lords of the coast were notorious usurpers in this till the reign of Louis XIII. when Cardinal Richelieu, by an order of the council (1629), much abridged them, but did not restore the law of nature, but only enlarged his and his successor's privileges. This produced much displeasure, but it was in vain. as the French kings were now masters of the lives and fortunes of their subjects, and their edicts were. "Car tel est notre plaisir," the standing reason of the French laws at that time. This seems to have been the inauguration of this prerogative of sovereignty in France, and this is the reason of the law. This order in council was re-enacted in the Ordinance of Louis XIV., and placed under the protection of the crown all wrecks, and gave one third to the salvors, one third to the admiral, and one third to the king.

The Laws of the Hanse Towns and the Laws of Wisbuy are silent upon the subject, and we are therefore to presume that, in the absence of law to the contrary, where these laws were the controlling authority, the law of nature prevailed. The decree of Adrian, referred to as meritorious in Justinian, lib. 2. tit. 1, § 39, which I consider relates only to treasures found, as the same section declares that if any treasures be found in a man's land it shall belong to the finder; if in the land of another, one half shall belong to the finder and one half to the owner of the land; but if in public domain, one half shall go to the emperor, or in any place owned by the city the one half shall go to the city; while subsequently speaking of goods found thrown out of vessels it says distinctly: "This law does not refer to them as they belong to the owner, or if goods have fallen from a carriage in motion they shall be considered in the same light." On the other hand, Loccenius says that in regard to shipwrecked goods it seems to be in accordance with equity and the jure gentium, or law of

nations, that in case no owner appear in a given time the greater part go to the public treasury and the lesser part to satisfy the finder for his care and custody. Locc. De Jure Mar. c. 7. The laws of France upon the subject have already been cited, and we now come to the decisions of English courts, and such intimations as have been given from time to time by the courts of our country upon the question.

The case of The Aquila, reported 1 C. Rob. Adm. 37, has been quoted as the leading case wherever the question of derelict has arisen. In that case Mr. Scott says: "It is certainly true that such property may be so acquired (by occupancy), but the question is, to whom is it so acquired? By the law of nature, to the individual finder or occupant. But in a state of civil society, although property may be acquired by occupancy, it is not necessarily acquired by the occupant himself, for the positive regulations of the state may have made alterations on the subjects, and may, for reasons of public peace and policy, have appropriated it to other persons; as, for instance, to the state itself, or to its grantees. It will depend, therefore, on the law of each country to determine whether property, so acquired by occupancy shall accrue to the individual finder, or to the sovereign and his representatives, and I consider it to be the general rule of civilized countries that what is found derelict on the seas is acquired beneficially for the sovereign if no owner shall appear. In England this right is as firmly established as any prerogative of the crown."

The only question now is whether the customs and laws of other nations, and the positive regulations of other states are to be taken and accepted as the positive laws of this country upon this point. We may first consider the origin and cause of the establishment of the claims of sovereignty. Chancellor Kent, in his Commentaries (section 1), recites fully the barbarities practiced towards shipwrecked persons and the systematic plundering and robbing resorted to, until finally, for the sake of humanity, the persons and property of those shipwrecked were placed under the special protection and safeguard of the crown. The prevention of the barbarous practice of destroying the property of the shipwrecked was the object of the law in conferring this prerogative on the king. Cro. Jur. Belli, 117, 132, 141, 142; Inst. 167; Moll. De Jure Mar. 237; Moor, 224; Hale, De Jure Mar. 40. This prerogative of the crown has not been considered sufficiently definite, regular, and certain to establish a principle of national law beyond this: that the protection of shipwrecked person and property is in the national sovereignty. Beyond this, all is uncertain and diverse. In this all commercial nations are interested, but not as to whether the sovereign or finder gets the residue. Constantine demands: "What right has a sovereign in

another's calamity, so that it should hunt for gain in such a woful case as this?" Under the Laws of Oleron the shipwrecked were protected in both person and property, but the sovereign claimed no advantage or gain from their misfortunes. In England protection of the crown is granted to all, but the residues are disposed of in different ways. The posthumous treatises of Lord Hale expressly states that by the general law things found in the open seas common to all nations still belong to the first occupant. Flotsam, jetsam, ligan, or other sea estray, if taken up in the wide ocean, belong to the taker of them, if the owner of them cannot be found, limiting the right of the crown to such things as are taken up within the king's seas. Hale, De Jure Mar. c. 7; Harg. Law Tracts, p. 41; Bl. Comm. bk. 1, p. 295; Id. bk. 2, p. 402; Palmer, Wreck. 8. By the order in council, 6th March, 1605, it was declared that derelict belong to the lord high admiral, wreccum maris, or property thrown ashore or resting in the bottom goes to the lord of the manor. King v. Forty-Nine Casks Brandy [3 Hagg. Adm. 282]; King v. Two Casks Tallow [Id. 298]. In Jersey, Guernsey, Alderney, and Sark, all wrecks that could be reached by a person standing on shore belong to the lord of the manor. Until recently the proceeds of derelicts were considered as perquisites of the admiralty and now pertaining to the crown as droits of admiralty. In France one third goes to the king, one third to the admiral; in Spain there is a portion goes to the king and a portion to the admiral.

Now, from these numerous diverse laws, no one of which is common to any two nations, but every one the positive result of legislative enactments or orders in council, applicable to the locality of which made, what are we to select as the general rule of civilized countries? There is one principle of equity and justice pervading the laws of all civilized nations upon this subject, not inconsistent with the laws of nature, and that is a prerogative of sovereignty to step in between the loser and the finder, the shipwrecked and the salvor, and protect both in their rights, to see that the distress of one is not taken advantage of by the cupidity of the others, but further than this I do not consider that we are bound by the maritime laws of the several nations to go. The reason for sovereign interference is satisfied and the wrong originally complained of remedied. For more than that I consider there is no binding authority, or general maritime law.

Although I have stated in the beginning of this opinion that I consider the question unsettled in the courts of our country, there have been certain dicta touching directly upon this point that I would not pass unnoticed. Judge Peters, in his notes attached to his opinion in the cause of Taylor v. The Cato [Case No. 13,786], and again in notes

attached to opinions in Brevoor v. The Fair American [Id. 1,847], states distinctly that "ships and goods deserted and found at sea, are national droits, if no owners appear. Also the produce of ships and goods unclaimed is, it should seem, also a national droit," and cites The Aquila [supra] as authority. Taylor v. The Cato, and Brevoor v. The Fair American [supra]. These, as being the opinions of so eminent an admiralty judge, although extrajudicial, I cannot pass without notice. He gives no reason or authority for his conclusions any further than citing the case mentioned; but upon a further examination of his decisions we find that his judgments upon this point was probably founded upon his opinions as to the succession of the United States to the laws, prerogatives, and droits of the English crown. In his notes to opinion in the case of Jennings v. Carson [Case No. 7,281], he says: "The practice and laws of the admiralty of England as they existed before our Revolution are particularly imperative to us." Again, in Thompson v. The Catharina [Id. 13,949], he says: "The change in the form of our government has not abrogated all the laws, customs and principles of jurisprudence we inherited from our ancestors, and possessed at the period of our becoming an independent nation. The people of these states, both individually and collectively, have the common law in all cases consistent with the change of our government and the principles on which it is founded. They possess in like manner the maritime law, which is part of the common law existing at the same period. It is then not to be disputed on sound principles that the court must be governed in its decisions by the maritime code we possessed at the period before stated." We see at once, from these quotations, upon what his opinions were based in the question under consideration. Chancellor Kent, in his Commentaries (lecture 36), also excepts wrecks from the general rule of occupancy, referring to Davie's Abridgement of American Law, which has also been referred to in the argument of this case, saying they are "to belong to the United States, as succeeding in this respect to the prerogatives of the English crown."

In the absence of the best authority, I should be loath to question for a moment the decisions of these able and learned gentlemen, but I consider that the opinion of the supreme court in the case of Wheaton v. Peters [8 Pet. (33 U. S.) 591], already referred to, in which it is declared that "there is no principle which pervades the Union and has the authority of law that is not embodied in the constitution or laws of the Union, and that the common law could be made a part of our federal system only by legislative adoption," so positively overrules this doctrine that I am justified in not adopting it. In the case of Peabody v. Twenty-Eight Bags of Cotton [Case No. 10,-869], Judge Davis seems to rest his decisions

—First, upon the utter absence of all precedents for giving the residue to the salvors; secondly, the succession of the United States to the rights prerogatives of the British crown; and, thirdly, the rule which he considered so fully established by the custom and usage of commercial nations as to be binding upon the admiralty courts in this country. Mr. Benedict says in his work on Admiralty (page 21, § 33): "The admiral in many countries had numerous powers, duties, and rights, which sprang from and relate to his military or naval character. All these portions of the power of the admiral which may be properly called executive or administrative are unknown to American admiralty; the trappings, perquisites, prerogatives, and droits of the admiralty are left to governments with which they are in harmony." Mr. Parsons, in his treatise on Maritime Law (volume 2, pp. 617, 618), says: "What disposition is to be made of property found abandoned when no one appears to claim it, cannot be said to be settled in this country. In an early case in Massachusetts it was held that after salvage was paid the property belonged to the government, to hold in trust until the owner should appear. In another district the practice, however, is to keep the proceeds a year and a day after the salvage is paid, and, if no owner then appears, to pay them to the finder. This, we think, is the more correct doctrine." We have been informed that subsequent to Peabody v. Twenty-Eight Bags of Cotton, supra, Judge Sprague has permitted the entire proceeds to be taken by the finder upon his filing a bond to respond to any subsequent order of the court. The rule and long-continued practice of Judge Marvin while on this bench in this district shows plainly that he was well satisfied with his opinion that "until some law is passed providing for the dispositions of derelict they belong, upon principles of national law, to the finder.

The supreme court, in the case of The Mary Ford, 3 Dall. [3 U. S. 188], intimates that on the principles of abandonment, the whole property might have been decreed, not to the United States, but to the libellants, and in the case of The Harrison it directed that the cause should be continued for a year and a day, and, if no claimant appear in that time, the property is presumed to be abandoned, and condemned to the captors. The reason urged for paying the proceeds into the treasury is that they may be more readily recovered by the claimants when claimed if ever. By the present rule the amount is by law deposited with some assistant treasurer of the United States to the credit of this court, and due publication made, and notice given. After the lapse of the time that has been decided by the supreme court as sufficient to raise presumption of an abandonment, the court may, at its option, deliver the property to the finder, or may, if there appear any probability of a claim, still retain charge of it, or acquire security from the finder to respond to any claim that

may be made. I can see no advantage to any subsequent claimant by a paying of the amount into the treasury of the United States. This court could compel no security from the government, and, if the property once passed from its control, the claimant would be forced to seek his rights in another court by a new suit, while, if left in control of this court, a simple order made herein would be sufficient.

It has been suggested as a prudential reason for making a change in the practice of this court in this matter, irrespective of the law, that it would remove the temptation that now exists to erase and obliterate marks and conceal facts and circumstances of finding by which a claimant might be discovered. On the other hand, it was, I believe, one reason assigned by Judge Marvin at the time he established the rule in accordance with the then existing practice, that such would tend to remove the temptation to conceal and convert to their own use many articles found derelict, which, if reported, might be claimed and returned to their owner. As prudential reasons, each of these has its weight; but it is not for me to decide what the law should be. That belongs to the legislative department. It is impossible to remove all temptations for avarice to commit crime, and this court, believing that it has a right of protecting absent owners in all cases of shipwrecked goods found derelict in this district, and will endeavor so to use that right, in either case avarice will learn that the safest way is to avoid crime, and not readily yield to slight temptations. Should the law of England prevail in this case here is a question whether, being wreck maris, or wreck of the sea, the state laws should not control, as there the proceeds would not go to the sovereign, but to the lord of the manor. and were held to be beyond the admiralty jurisdiction.

I have thus at length reviewed the question under consideration with attendant questions arising by the way at a far greater length than I had at first contemplated, and have embodied much that might by some be considered but ill befitting a judicial opinion, but in arriving at my conclusion I have examined carefully both sides of the question, and quoted largely, rather reviewing the whole question than confining myself to my opinion on it. Finally, I would hereby state the conclusion I have arrived at.

First. That the United States has not, by any positive enactment or regulation, claimed the proceeds of derelict.

Second. That the prerogative rights or national droits of the English sovereignty have not been succeeded to by the United States by rights of succession merely.

Third. The admiralty rules, regulations. and laws of England are only binding upon the admiralty courts of this country so far as they are in unison and harmony with the maritime law of all nations, and in none of their local municipal features.

Fourth. That the only principle in the maritime law in regard to estrays of the sea or derelicts common to civilized nations, or binding as such, is that the sovereign power shall protect the persons and property of all who may have suffered shipwreck, and see that they have a fair opportunity to claim and obtain the same.

Further than this, the usages and customs are diverse, local, and municipal, and not binding as a portion of the maritime law of nations. That a certain time is sufficient to warrant the presumption of abandonment, and that time has been fixed at a year and a day. That after that it is within the power of the sovereign to grant the natural rights of occupants to the finder or claim the property, but such natural rights cannot be overcome but by positive law.

The court will in its judicial capacity protect in every way possible absent owners, and does not consider it binding to make any order at the lapse of a year and a day if sufficient notice has not been given, or there is a probability of a claim being filed; and although by the rule of the court the residue may be paid the finder, it is within the option of the court, and not obligatory.

I may be wrong in these conclusions, or any of them upon which this question depends. It affords me satisfaction to know that there are higher tribunals who may correct any error I may have made. The prayer of the motion must be denied.

Upon appeal to the circuit court, judgment was given for appellees by Justice Woods without opinion.